UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
K.B. on behalf of S.B.,

                                              Plaintiff,

                                                                    **OPINION & ORDER**

          - against -
                                                                    No. 18-CV-9553 (CS)

KATONAH LEWISBORO UNION FREE
SCHOOL DISTRICT,

                                              Defendant.
--------------------------------------------------------------x

Appearances:

Peter D. Hoffman
Law Office of Peter D. Hoffman, PC
Katonah, New York
*Counsel for Plaintiff*

Daniel Petigrow
Steven L. Banks
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, New York
*Counsel for Defendant*

Seibel, J.

          Before the Court are Plaintiff's motion for summary judgment, (Doc. 18), and

Defendant's cross-motion for summary judgment, (Doc. 12).  Plaintiff K.B. ("KB" or the

"parent") brings this action on behalf of her child, S.B. ("SB"), against Defendant Katonah

Lewisboro Union Free School District (the "District") pursuant to the Individuals with

Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et seq.*;[1] Article 89 of the

New York State Education Law; and Part 200 of the Regulations of the Commissioner of

_____

          [1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the
IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

Education.  Plaintiff seeks review of an administrative decision by a State Review Officer ("SRO") at the New York State Education Department affirming the decision of an Impartial Hearing Officer ("IHO").  The IHO found that (1) there was no basis to conclude that the District violated its Child Find obligation relative to SB; (2) the District failed to establish that it provided a Free and Appropriate Public Education ("FAPE") during the 2015-16 and 2016-17 school years because its state-approved nonpublic program recommendation for 2015-16, the Karafin School ("Karafin"), and its in-district public school recommendation for 2016-17, a therapeutic support program at John Jay High School, were not sufficient to meet SB's educational needs; (3) the District's denial of a twelve-month program for 2015-16 did not deny SB a FAPE; (4) the private school – Robert Louis Stevenson School ("RLS") in New York City – at which KB placed SB for the 2015-16 and 2016-17 school years was an appropriate placement; and (5) equitable considerations supported reduction of tuition reimbursement for the 2015-16 school year by 20% because KB did not fully cooperate with the District's attempts to locate an appropriate placement, and supported full reimbursement for the 2016-17 tuition. (Decision of IHO Judith Schneider, dated Feb. 13, 2017 ("IHO Decision"), at 43-44, 46-47, 50, 52, 55-56.)[2]

The SRO found that evidence in the record (1) supported the IHO's determination that the District did not violate its Child Find obligations; (2) did not support the IHO's determination

---

[2] The IHO Decision forms part of the administrative record, a certified hard copy of which was sent to the Court on March 4, 2019.  The exhibits cited herein also form part of the administrative record developed before the IHO, presented to the SRO, and filed under seal. Defendant's exhibits are referred to here as "D's Ex. [exhibit number]."  Plaintiff's exhibits are referred to here as "P's Ex. [exhibit letter]."  The IHO's exhibits are referred to here as "IHO Ex. [exhibit numeral]."  The complete list of exhibits is part of the record that was submitted to the SRO.  The transcript from the hearing before the IHO, also part of the record submitted to the SRO, is cited herein as "Tr. at [page number]."

that the District failed to offer SB a FAPE for the 2015-16 and 2016-17 school years; and (3) supported the IHO's determination that the District's denial of a twelve-month program for 2015-16 did not deny SB a FAPE. (Decision of SRO Carol H. Hauge, dated June 25, 2018 ("SRO Decision") at 17, 24, 36.)[3]

Plaintiff seeks an order (1) affirming the IHO's decision to award tuition reimbursement and reversing her decisions on the twelve-month program and the 20% deduction; (2) reversing the SRO's decision in its entirety; and (3) directing the District to reimburse Plaintiff. (Doc. 1 ("Compl.") at 22-23.) For the following reasons, Plaintiff's motion is DENIED and Defendant's motion is GRANTED.

## I.     BACKGROUND

### A.     Facts

The following facts are undisputed unless otherwise noted.

SB attended John Jay High School ("John Jay") in the District during the 2014-15 (ninth grade) school year. (SRO Decision at 3.) In late May 2015, SB was admitted to a psychiatric hospital because she engaged in self-injurious behavior and expressed suicidal ideation. (*Id.*) She remained hospitalized until October 2, 2015, and then received home-based and online tutoring. (*Id.*)

On August 28, 2015, at KB's request, SB was referred to the local Committee on Special Education ("CSE"), which included parents, teachers, a school psychologist, and a district representative. (*Id.* at 1, 3; IHO Decision at 39.) On October 5, 2015, the CSE found SB to be eligible for special education services because she was a student with an emotional disturbance. (SRO Decision at 3.) The CSE was responsible for working with SB and KB to develop an

---

[3] The SRO Decision, like the IHO Decision, forms part of the administrative record.

Individualized Education Program ("IEP") that set forth SB's social, emotional, and educational needs and goals. *See* 20 U.S.C. § 1414(d)(1)(A)-(B); 34 C.F.R. §§ 300.320-21; N.Y. Educ. Law § 4402; 8 N.Y.C.R.R. §§ 200.3, 200.4(d)(2).

During the October 5, 2015 meeting, the CSE discussed SB's program and placement and recommended, among other things, a 12:1+1 special class placement in a state-approved "therapeutic day program," along with twice-weekly 1:1 counseling, weekly group counseling, and a bimonthly dialectical behavior therapy ("DBT") session with SB's private psychologist (the "October 2015 IEP"). (SRO Decision at 3.) The District agreed to research therapeutic day schools and sent referrals to public and private schools. (*Id.*) On October 26, 2015, Karafin accepted SB. (*Id.* at 3-4.)

On November 12, 2015, the CSE reconvened, recommended that SB attend Karafin, and modified the October 2015 IEP to include a 6:1+1 special class placement and weekly 1:1 and group counseling (the "November 2015 IEP"). (*Id.* at 4.) The November 2015 IEP recommended fewer individual counseling sessions because SB would have access to daily, on-demand counseling sessions at Karafin. (*Id.* n.5.) By letter dated November 12, 2015, KB rejected the CSE's recommendations in the November 2015 IEP and informed the District that SB would attend RLS beginning November 30, 2015. (*Id.* at 4.) KB also sought reimbursement for tuition and transportation costs. (*Id.*) The District denied the former but provided the latter during the school year. (Doc. 15 ¶ 1; Doc. 26 ¶ 92.)

On February 22, 2016, the CSE convened to discuss whether SB needed twelve-month education services, and decided that she did not. (SRO Decision at 4.)

On May 9, 2016, the CSE convened to review SB's progress and develop her IEP for the 2016-17 school year. (*See id.*) The CSE recommended an 8:1+1 special class placement for

English language arts and social studies in a newly minted DBT-based "therapeutic support program" at John Jay, the District high school, along with weekly 1:1 and small group counseling, a daily support period, a weekly DBT skill session, and daily access to a teaching assistant and clinical support. (*Id.*) The CSE proposed that it would collaborate with RLS to help SB transition into the program at John Jay, and suggested flexible pickup, drop-off, and classroom schedules so SB could avoid large groups. By letter dated May 25, 2016, KB rejected the CSE's recommendations and indicated that SB would attend RLS in summer 2016 and during the 2016-17 school year. (*Id.*)

### B.    Procedural History

#### 1.    Due Process Complaint

KB filed a due process complaint on July 19, 2016. (IHO Ex. I.)[4] Plaintiff alleged that the District failed to offer SB a FAPE for the 2015-16 and 2016-17 school years in that it failed to (1) "identify, locate and evaluate SB as a child with a disability"; (2) "provide SB with appropriate academic instruction and counseling services"; (3) "provide competent and qualified providers for services" required by her IEPs; and (4) acknowledge KB's requests for and "engage in a diligent search for an appropriate out-of-district placement." (*Id.* at 2-3.) Plaintiff also asserted that SB's placement at RLS was appropriate because "it was a small therapeutic preparatory school for students . . . with social, emotional and learning challenges." (*Id.* at 13.) Plaintiff sought an order from the IHO (1) finding that the 2015-16 and 2016-17 IEPs were not appropriate, (2) finding that RLS was appropriate, (3) directing the District to reimburse Plaintiff

---

[4] The due process complaint consists of a cover page, a three-page affirmation of service, a four-page New York State due process complaint notice form, and an "addendum" consisting of fifteen consecutively numbered pages, followed by exhibits. (IHO Ex. I.) Page numbers in citations to the due process complaint refer to the fifteen consecutively numbered pages in the addendum.

for compensatory education as a remedy for the District's failure to provide a FAPE, (4) directing the District to reimburse Plaintiff for tuition and transportation for SB's placement at RLS for the 2015-16 and 2016-17 school years, including summer 2016, and (4) awarding Plaintiff attorney's fees and costs. (*Id.* at 15.)

### 2. IHO Decision

On November 2, 2016, the IHO commenced a hearing, which concluded on September 28, 2017 after fourteen nonconsecutive days of testimony. (IHO Decision at 6.) In her lengthy and thorough decision, issued February 13, 2017, the IHO first found that she had no basis to conclude that the District violated its Child Find obligation relative to SB when it failed to undertake a CSE evaluation before August 28, 2015, when KB requested such an evaluation. (*Id.* at 37, 56.) The IHO observed that neither SB's clinician nor KB requested a CSE evaluation or suggested that one might be warranted any time before August 28, 2015. (*Id.*) While SB "made 'very superficial cut marks' on her wrist" on March 10, 2015, reported suicidal thoughts on April 27, 2015, and cut herself again on May 14, 2015, (*id.* at 38), she "maintained very good grades," "her attendance record remained unchanged and appropriate" until she left school in late May 2015, and she made "academic progress" through the spring, (*id.* at 38-39). The IHO found that, in light of SB's academic progress, the limited period before she withdrew, and the District's awareness that she was receiving private psychiatric and psychological treatment, the District did not violate its Child Find obligation. (*Id.* at 39.) The IHO further observed that the District "acted expeditiously" after KB requested a CSE evaluation, noting that KB has a Masters degree in Special Education and had experience with CSE meetings, and that SB's brother was a student with a disability and had an IEP during the 2014-15 school year. (*Id.* at 39-40.) The IHO concluded that "the fact that no evaluation was requested by this sophisticated

and knowledgeable parent was volitional," and therefore the District's failure to refer SB did not cause any "detriment" to SB. (*Id.*)

Next, the IHO found that the District failed to provide a FAPE during the 2015-16 and 2016-17 school years. As to 2015-16, the IHO found that the District failed to provide a placement that could appropriately implement the IEP with respect to SB's therapy because Karafin did not have a counselor or clinician sufficiently familiar with DBT "to support DBT skills/techniques." (*Id.* at 43-44.) She concluded that the placement would not "enable the student to make meaningful gains." (*Id.* at 44.) As to 2016-17, the IHO found that the District's placement of SB at John Jay put SB "at substantial risk of regression." (*Id.* at 48.) The IHO credited the testimony of SB's private clinician Dr. Miller, who stated that SB perceived difficulties at the school when she attended in 2014-15 and was "at least to a degree 'traumatized.'" (*Id.* at 48-49.) The IHO also observed that SB reported daily panic attacks, cutting behaviors, and suicidal ideation while she was a student there, and that a large school would not be appropriate for her. (*Id.* at 49.)

The IHO also found that the District's denial of a twelve-month program for 2015-16 (that is, summer school) did not deny SB a FAPE because she was not at risk of "substantial regression." (*Id.* at 45-47.) She had not lost credits as a result of her hospitalization and was on track to graduate on time. (*Id.* at 46.) The IHO noted that, when Dr. Miller observed her and raised the risk of regression, SB had only been working with him for a short time. (*Id.*) The IHO also credited her "great success academically and socially" and found "there was no reason to think that would not continue." (*Id.*) The IHO further noted SB's "very significant clinical and other support," indicating that she would not be "at risk of life-threatening actions." (*Id.* at 47.)

Next, the IHO found that Plaintiff had met her burden of showing the appropriateness of SB's placement at RLS. (*Id.* at 52.) She noted that RLS's use of DBT and cooperation with Dr. Miller was "substantially similar" to the District's DBT-based program at John Jay. (*Id.* at 51.) She observed that RLS "was informed of the student's needs and issues and was appropriately responsive." (*Id.*) She also credited Dr. Miller's endorsement of the school's advisory program. (*Id.*) She noted SB's "substantial academic progress," "favorable" teacher comments, and "very substantial social/emotional progress." (*Id.* at 51-52.) Finally, she concluded that these factors outweighed the two to two-and-a-quarter hour bus trip required to get to RLS – "a relatively small price to pay." (*Id.* at 52 (internal quotation marks omitted).)

Finally, with respect to equitable considerations, the IHO found that "there was substantial basis for parental objection to a return to [John Jay]." (*Id.* at 54.) As to the 2015-16 school year, however, the IHO found that KB refused to visit a program at Ardsley that may have been suitable for SB, and concluded that "the parent's refusal to visit Ardsley was because she preferred that the student attend RLS and therefore . . . she failed to cooperate with the district." (*Id.* at 55.) The IHO accordingly recommended that the tuition reimbursement for the 2015-16 school year be reduced by 20%. She found no basis for denying or limiting reimbursement for the 2016-17 school year. (*Id.* at 56.)

### 3. SRO Decision

KB appealed the IHO's partial denial of her request to be reimbursed for the 2015-16 school year. The District cross-appealed the IHO's determinations that it failed to offer a FAPE for the 2015-16 and 2016-17 school years. (SRO Decision at 1.)

On June 25, 2018, the SRO issued a lengthy and thorough opinion dismissing KB's appeal and sustaining the District's cross-appeal. In doing so, the SRO carefully examined the

record and the IHO Decision.  (*Id.* at 2-8, 37.)  KB first asserted that the IHO erred in finding

that the District did not violate its Child Find obligations because "it was obvious by the spring

of 2015 that the student had an emotional disturbance and that this required an examination by

the CSE."  (*Id.* at 8 (internal quotation marks and alterations omitted).)  The SRO disagreed,

finding that the record showed that it was not clear before August 2015 that SB had an emotional

"disability that may have required special education services."  (*Id.* at 13.)  The student did well

academically in the 2014-15 school year, and while the SRO acknowledged that the District may

have been aware of SB's "social/emotional difficulties" as of May 2015, her attendance was fine

and her grades suggested that she "made continuous steady improvement" despite those

difficulties.  (*Id.* at 14-15.)  The SRO noted that by the time the District may have learned of the

severity of SB's difficulties in late May, SB was in the hospital, (*id.* at 13-14, 17), and it was

unclear what the District could have done from that point until her release in October 2015,

whereupon the CSE acted promptly, (*id.* at 17-18).  Additionally, KB did not request any relief

related to Child Find violations.  (*Id.* at 18.)

The SRO reversed the IHO's conclusion that the District failed to offer SB a FAPE for

the 2015-16 school year.  The SRO concluded that the CSE made recommendations "to address

the student's needs," and that while Karafin did not offer the DBT that SB had received in the

hospital, none of the evaluations and reports available to the CSE at the time of the October 2015

IEP – including the treatment summary from the hospital where SB received DBT – stated that

SB required a placement in a DBT program.  (*Id.* at 19-21.)  The SRO found that the record did

not support the IHO's finding that SB would receive "no meaningful support" during her

transition from the hospital to Karafin.  (*Id.* at 21.)  The SRO also found that the evidence

"indicated that Karafin could implement" bimonthly meetings between SB and Dr. Miller as required by the IEP.  (*Id.* at 22.)

Next, the SRO affirmed the IHO's conclusion that twelve-month services were not required for SB to receive a FAPE.  (*Id.* at 27.)  She found that the record showed that SB did not "exhibit any concerning behaviors" or "substantial regression" during the 2015-16 school year. (*Id.* at 25.)  SB was "progressing and doing very well" academically and "able to successfully transition back to school after winter break."  (*Id.* at 25-26.)  While the request for summer services was based on the risk that SB might lack sufficient credits to graduate on time, the record before the CSE was clear that she was on track to graduate without the need for any credits over the summer months.  (*Id.* at 26-27.)  In sum, the hearing record supported the IHO's conclusion that summer school was not required.

As to the 2016-17 school year, the SRO reversed the IHO's determination that the District failed to offer "a program reasonably calculated to enable the student to make meaningful education gains," (*id.* at 36 (internal quotation marks omitted)), because the hearing record did not support a finding that SB would have a "substantial risk of regression" if she attended a program housed at John Jay, (*id.* at 27).  The SRO noted that the evidence showed SB made "excellent progress" at RLS, was meeting personal goals, and "was very well liked."  (*Id.* at 28.)  The IHO had been persuaded by Dr. Miller's testimony that the benefits of the DBT program offered at John Jay were outweighed by SB's risk of regression and her prior negative experiences in that school.  (*Id.* at 33-34.)  But the SRO found that the evidence supported that John Jay could offer a "small, supportive and structured academic environment," and that SB's troubling experiences there occurred before she received special education services.  (*Id.*) Finally, the SRO concluded that a panic attack that SB had at a driver's education course – which

in any event was not before the CSE because it occurred after the 2016-17 IEP was finalized – did not mean that SB "would not have been able to receive academic benefit" through the DBT program at John Jay. (*Id.* at 36.)

Because the SRO determined that the District provided a FAPE for the 2015-16 and 2016-17 school years, and because she affirmed the IHO's determination that SB did not require twelve-month services, she declined to reach the issues of whether RLS constituted an appropriate placement or whether equitable considerations favored reimbursement. (*Id.*)

## II.  LEGAL STANDARDS

### A.  Summary Judgment Standard for IDEIA

Motions for summary judgment customarily resolve IDEA actions in federal court. *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003). Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. *Id.* Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted). In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted). The district

court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision. *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks omitted). Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Accordingly, "a court must defer to

the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to "the application of expertise and the exercise of judgment by school authorities" is appropriate where they "offer a cogent and responsive explanation for their decisions."  *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017).

###### **B.**      **Provision of a FAPE and Unilateral Placement in Private Schools**

"The IDEA requires States receiving federal funds to provide 'all children with disabilities' with a FAPE," which includes "'special education and related services' tailored to meet the unique needs of a particular child."  *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir.) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)), *cert. denied*, 139 S. Ct. 322 (2018).  Related services include "'transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'"  *Mr. P*, 885 F.3d at 741 (quoting *Endrew F.*, 137 S. Ct. at 994).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child."  *Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements."  *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's

procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'" *Mr. P*, 885 F.3d at 748 (alteration omitted) (quoting *Endrew F.*, 137 S. Ct. at 999). "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress." *N.B.*, 711 F. App'x at 32. "What the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014). "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Id.* (internal quotation marks omitted).

"New York's regulations implementing the goals of the IDEA appear to track the IDEA closely." *P.C.*, 232 F. Supp. 3d at 408 (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363 (2d Cir. 2006)); *see* N.Y. Educ. Law §§ 4401 to 4410-b. Parents are entitled to challenge "any matter relating to the identification, evaluation or educational placement of the student or the provision of a free appropriate public education to the student." N.Y. Educ. Law § 4404(1); *see*

*also* 20 U.S.C. § 1415(b)(6)(A) (same). Such challenges must be heard at an impartial due process hearing conducted by the state or local education agency, *see* 20 U.S.C. § 1415(f), and either party may appeal an adverse decision to the appropriate state agency, *see id.* § 1415(g); N.Y. Educ. Law § 4404(2). Once this administrative process is exhausted, a party may file a civil action in federal or state court challenging the administrative decision. *See* 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

"If a state receiving IDEA funding fails to give a disabled child a FAPE . . . , the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (internal quotation marks omitted). Parents who seek such reimbursement must satisfy the three-pronged "*Burlington/Carter*" test, which looks to (1) whether the school district's proposed program will provide a FAPE; (2) whether the parents' private placement is appropriate; and (3) a consideration of the equities. *See generally Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985). To satisfy the first prong, the school district bears the burden of proving that it timely provided a FAPE to the student. N.Y. Educ. Law § 4404(1)(c); *see T.K. ex rel. L.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) ("Under New York law, the Department [of Education] bears the burden of establishing the validity of the IEP."). To satisfy the second prong, the parent bears the burden of demonstrating that the unilateral private placement was appropriate. *See, e.g.*, *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). Whether a parental placement is appropriate turns on "whether a placement – public or private – is reasonably calculated to enable the child to receive educational benefits." *Frank G.*, 459 F.3d at 364 (internal quotation marks omitted).

### C.     Child Find Obligation

"IDEA contains a 'Child Find' obligation, which is a duty to identify, locate, and evaluate children who are suspected of having a disability and who are in need of special education and related services." *R.E. ex rel. M.E. v. Brewster Cent. Sch. Dist.*, 180 F. Supp. 3d 262, 268 (S.D.N.Y. 2016). The obligation extends to all children suspected of having a disability requiring special education, "even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1). But "Child Find does not demand that schools conduct a formal evaluation of every struggling student." *Mr. P*, 885 F.3d at 749.

A state's duty to evaluate a student can be triggered by the school district, the student's parents, or others. 20 U.S.C. § 1414(a)(1)(B); *see* 8 N.Y.C.R.R. § 200.4(a) ("The school district must initiate a referral and promptly request parental consent to evaluate the student to determine if the student needs special education services and programs if a student has not made adequate progress after an appropriate period of time . . . ."). Once such a request has been made, the IDEA requires that the school district evaluate the child within sixty days to determine whether the child is a child with a disability under the IDEA. *See* 34 C.F.R. § 300.301; 8 N.Y.C.R.R. § 200.4(b). A violation of the Child Find obligation is a procedural violation of the IDEA. *Mr. P*, 885 F.3d at 750.

> To hold a school district liable for failing to identify a student who should be evaluated for purposes of receiving special education, a claimant must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate.

*Id.* (internal quotation marks omitted).

III.    **DISCUSSION**

A.    **The District's Child Find Obligation**

KB argues that the District violated the Child Find obligation under the IDEA by failing to promptly identify SB as eligible for special education. (Doc. 19 ("P's Mem.") at 6-9.) The District contends that Plaintiff does not request any relief in the Complaint for the District's alleged violation of its Child Find obligations and that, therefore, a ruling on the Child Find issue would constitute an improper advisory opinion. (Doc. 14 ("D's Mem.") at 23-24; *see* Compl. at 22-23.) Although Plaintiff does not include Child Find in the "wherefore" section of the Complaint, (Compl. at 22-23), elsewhere she requests reversal of the SRO's and IHO's "Child Find findings for the spring of 2015," (*id.* ¶ 4(a)(i)). Accordingly, even though Plaintiff does not explain what remedy she seeks for the alleged violation, I address the issue.

Because KB is faulting the District for failing to evaluate SB in a timely manner, "the Court must focus on what the District knew and when." *See J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 662 (S.D.N.Y. 2011). According to KB, the District had reasonable notice of SB's disability because "school personnel" including a school nurse, social worker, and guidance counselors witnessed SB's "breakdowns and cutting" in May 2015, and KB asked for an IEP and called the principal to discuss special education in or before early August 2015. (P's Mem. at 8-9.) The District contends that the evidence supports the SRO's conclusion that, because of SB's strong academic performance, the District had no reason to suspect a disability requiring special education services until late May 2015, at which point SB was hospitalized and the District was unable to evaluate her. (D's Mem. at 24.) I agree.

A John Jay social worker testified that SB came to his attention in spring 2015 because she was "having some emotional issues" and displaying "concern[ing]" behaviors. (Tr. at 682-

83.)  The social worker was aware that SB had a cutting incident that spring, but believed that

her cuts were "superficial."  (*Id.* at 756.)  He did not have permission to speak with her therapist,

(*id.*), but was aware she was receiving medication and treatment, (Tr. at 1222-23).  According to

"protocol" in the school, "If a student is cutting themselves, it doesn't automatically mean we do

anything differently than contact the parent, contact the outside therapist.  If the outside therapist

has recommendations, we follow those recommendations."  (*Id.* at 758-59.)  KB authorized SB's

therapist to speak with the school on May 14, 2015, (D's Ex. 97), and SB was removed from

school and hospitalized on May 20, 2015, (Tr. at 730:12-731:10).  The SRO noted that the

District was unaware that SB moved to a second hospital in late June until "after the parent

referred the student to the CSE in August 2015."  (SRO Decision at 18.)  In light of this timeline,

I agree with the SRO that "it is unclear whether and to what extent the district would have been

capable of initiating its procedures to identify, locate, and evaluate the student."  (*Id.*)  Further,

SB was doing well in school throughout the spring.  (*Id.* at 14-15.)  *See J.S.*, 826 F. Supp. 2d at

662 (finding school district had no reason to suspect disability given student's "level of academic

achievement").  And in any event Plaintiff does not say what services SB should have gotten

before October (when she was released from the hospital).  Finally, deference is "particularly

warranted" because the IHO and the SRO decisions are in agreement that the District did not

violate its Child Find obligation.  *See P.C.*, 232 F. Supp. 3d at 407.  I thus conclude that the SRO

did not err in so finding.

### B.    2015-16 School Year FAPE

Plaintiff argues that the Court should reverse the SRO's decision that the October and

November 2015 IEPs were appropriate for SB and affirm the IHO's decision that they were not.

First, Plaintiff contends that "[t]he SRO was not thorough and careful."  (P's Mem. at 9-10.)  I

disagree. The SRO's review of the record was thorough – she considered the evidence submitted by the parties as well as the IHO's reasoning – and she set forth her decision in a well-reasoned, detailed opinion. *See P.C.*, 232 F. Supp. 3d at 410 (well-reasoned, detailed opinion entitled to deference). The SRO's decision deserves deference from this Court, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . ."), and the preponderance of the evidence, *see* 20 U.S.C. § 1415(i)(2)(C)(iii), supports her conclusions, for the reasons discussed below.

Plaintiff argues that the District admitted that Karafin was not appropriate for 2015-16 when it recommended that SB attend a new DBT program at John Jay in 2016-17. (P's Mem. at 10.) But the evidence is that the District introduced that program because District staff "felt strongly" that an "in-house" DBT program would be beneficial for its students. (Tr. at 109-10.) Adopting an in-house program and recommending that SB be placed in it is not evidence that Karafin was inappropriate for SB. Plaintiff's argument simply does not follow. Moreover, it is reasonable and understandable that the District would want to educate its students in-house if possible, especially in light of the requirement that students be placed in the least restrictive environment. *See Avaras*, 2019 WL 4600870, at *2. There is no evidence that any shortcoming of Karafin had anything to do with the institution of the in-house program. To the contrary, the evidence in the record shows that Karafin was appropriate. Based on the treatment summary and recommendations from the DBT program at the hospital, (*see* D's Ex. 15), and the recommendations from a psychological evaluation provided to the CSE, the CSE concluded that SB "needs small class sizes, rich academic curricula and access to emotional and social supports . . . in order to prevent regression to the high-risk behaviors around self-injury and

suicide," (D's Ex. 17 at 1 (alteration in original)).  Karafin provides small class sizes, (*see* Tr. at

81, 397 ("six students, teacher, teacher's aide")), and weekly individual and group, as well as on-

demand, counseling, (*id.* at 401).  It also offers a Regents curriculum, and seventy percent of

students graduate and go to college.  (*Id.* at 398.)  And Karafin has experience consulting with

private therapists who use DBT and employed counselors who had worked with students in DBT.

(*Id.* at 77-78.)[5]

    Plaintiff also argues that "none of the students proposed for the class that SB would be in

were a match for her academic and cognitive profile."  (P's Mem. at 10.)  But the portion of the

hearing transcript cited by Plaintiff concerns a tenth-grade English class and does not discuss

SB's or her potential classmates' academic or cognitive abilities.  (Tr. at 434-35.)

    The SRO therefore reasonably concluded that the CSE's October 2015 and November

2015 IEPs made it likely that the proposed program would yield progress appropriate in light of

SB's circumstances, which satisfies the District's obligations under the IDEIA.  *See Endrew F.*,

137 S. Ct. at 999.  According due weight to the SRO's reasoned conclusion regarding the services

---

[5] Plaintiff argues that Dr. Miller believed Karafin was "lacking in the area of DBT," (P's Mem. at 10), but Plaintiff's argument mischaracterizes his testimony.  When asked, Dr. Miller "couldn't make any recommendations" about Karafin because he had not heard anything about it recently.  (Tr. at 1994.)  He recalled only that Karafin was "one of the schools" that SB and KB considered.  (*Id.*; *id.* at 2275.)  Dr. Miller also testified that, "to be complementary to the [DBT] work that [he is] doing in an out-patient setting," school personnel would need to have some sort of DBT training.  (*Id.* at 2277.)  Plaintiff argues, and the IHO concluded, that that meant that Karafin was inappropriate for SB because it would be unable to implement her IEP.  But as the SRO cogently explained, "the November 2015 IEP did not require DBT services [to] be provided directly to the student," (SRO Decision at 24); rather, it required a placement that could "support DBT skills/techniques," but the DBT was to be provided by Dr. Miller, (*id.*; *see* D's Ex. 46 at 8).  And in any event, Dr. Miller was not present at the CSE meetings in October and November 2015, and his hearing testimony cannot be used to retrospectively attack the placement recommendation.  *See C.R. v. N.Y.C. Dep't of Educ.*, 211 F. Supp. 3d 583, 611-12 (S.D.N.Y. 2016) (adequacy of IEP is to be evaluated based on information available to CSE at the time); *D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F Supp. 2d 344, 361 (appropriate IEP may not be rendered inadequate through evidence not before CSE).

proposed by the District, I agree that the 2015-16 IEPs provided SB with a FAPE. *See P.C.*, 232

F. Supp. 3d at 410.

C.    <u>2016-17 School Year FAPE</u>

Plaintiff argues that the Court should reverse the SRO's decision that the 2016 IEP was

appropriate for SB and affirm the IHO's decision that it was not appropriate. According to

Plaintiff, the IEP's inappropriateness is supported by Dr. Miller's testimony. (P's Mem. at 13-

14.) Dr. Miller testified that SB "felt that her prior year's experience at Katonah-Lewisboro was

not sufficiently supportive or structured or therapeutic." (Tr. at 1984-85.) But the SRO

concluded that the hearing record did not support the conclusion that "the student would be

unable to attend based on past experiences" in the school because she had not been receiving

special education services when she attended in the past. (SRO Decision at 34.) It was

reasonable to conclude that with the therapeutic supports of the program, SB would be better

able to handle attendance at John Jay.

Dr. Miller also testified that SB reported that she felt overwhelmed by the building size,

class size, and "less supervision." (Tr. at 1985.) But the SRO found, based on the evidence

available to the CSE at the time – including that the DBT program at John Jay was small and

would be housed in a building apart from the main school – that the transition plan and other

therapeutic supports in the 2016 IEP would address SB's anxiety.[6] Based on my review, the

evidence adequately supports the SRO's decision, and the appropriateness of SB's placement at

the John Jay DBT program is a matter requiring educational expertise. *See M.H.*, 685 F.3d at

---

[6] Evidence that SB had a panic attack during driver's education in the District, (*see* P's
Ex. Y at 293 (email referring to incident on Sept. 27, 2016)), was not available to the CSE in
May 2016 because the incident had not yet occurred. Accordingly, I do not consider it. *See
C.R.*, 211 F. Supp. 3d at 611-12; *D.A.B.*, 973 F. Supp. 2d at 361.

244. Accordingly, I must not substitute my "own notions of sound educational policy" for those of the school authorities. *Rowley*, 458 U.S. at 206. The SRO thus appropriately found that the District offered SB a FAPE for the 2016-17 school year.[7]

### D. Summer 2016

Plaintiff also argues that both the IHO and the SRO wrongly decided that the District's failure to provide SB with an extended school year was appropriate. (P's Mem. at 10-11.) School districts can be required to provide special education services during summer recess for "students whose disabilities are severe enough to exhibit the need for a structured learning environment of twelve months duration to maintain developmental levels." N.Y. Educ. Law § 4402(2)(a). "In determining whether extended school year services are necessary for the provision of FAPE, courts often focus on whether the student is likely to regress during the summer recess." *Antignano ex rel. R.A. v. Wantagh Union Free Sch. Dist.*, No. 07-CV-2540, 2010 WL 55908, at *12 (E.D.N.Y. Jan. 4, 2010).

According to Plaintiff, two doctors who were in a position to know – SB's private clinician, Dr. Miller, and the clinical director at RLS, Dr. Farina – testified in favor of an extended school year because of the risk that SB would regress without the structure of a summer program. Dr. Miller testified that he was "worried . . . that she would have a hard time and potentially regress" without a summer program. (Tr. at 1977-78.) Dr. Farina testified that she

_____

[7] Plaintiff's argument that SB should not have been expected to attend John Jay because its "culture" was not as supportive as a therapeutic school collides with the IDEA's mandate that services be provided in the least restrictive environment and that students be educated alongside their non-disabled peers to the extent possible. *See T.M.*, 752 F.3d at 163. The same is true for SB's concern, argued below and credited by the IHO, that her peers might learn that she was receiving services if she attended John Jay. (*See* SRO Decision at 35.) While I understand that concern, it cannot in itself justify an out-of-District placement; if it did, students who could be appropriately educated in a less restrictive environment would routinely be sent to a more restrictive one.

"felt strongly" that SB should attend summer school because "maybe six months" had passed since her "very intensive inpatient program," putting her "at significant risk for regression emotionally." (*Id.* at 1868-69.) But Dr. Farina did not make an emotional regression argument in her letter to the CSE in February 2016; she urged a summer program so that SB could "recover credits that were lost during her hospitalization and graduate on time." (D's Ex. 54.)

The evidence adequately supports the SRO's conclusion that SB was unlikely to "regress emotionally" during summer 2016. (SRO Decision at 25.) Her transition to RLS was "very smooth," she earned straight As, and her teachers had "nothing but positive feedback" about the transition. (Tr. at 1864-66.) SB was on track to graduate on time, had exhibited academic and social/emotional progress, and successfully transitioned back to school after winter break. (D's Ex. 56 at 2.) The SRO found that, even though SB lost school time during her hospitalization in 2015, the evidence did not indicate "that the student had previously exhibited substantial regression in the form of any loss of skills, either academically or socially/emotionally." (SRO Decision at 26-27.) This reasoned decision warrants deference. *See Antignano*, 2010 WL 55908, at *12.

*        *        *

I recognize and understand Plaintiff's desire to obtain the best possible education for SB, as well as her dissatisfaction with the outcome of the placement process. But the law does not require the District to place SB in the best possible environment; it merely requires the District to make a recommendation that is reasonably calculated to enable SB to make progress appropriate in light of her circumstances in the least restrictive environment. *See Endrew F.*, 137 S. Ct. at 999. The issue is not whether RLS could meet SB's needs better than Karafin or the DBT program at John Jay. Rather, it is whether there are adequate grounds for me to overrule the

SRO's judgment that the District's IEPs recommending the latter programs offered SB a FAPE. I find that there are not.

Because I find that Karafin was an appropriate recommendation for the 2015-16 school year, and that the DBT program at John Jay was an appropriate recommendation for the 2016-17 school year, I need not address whether KB's unilateral placement at RLS was appropriate or whether equitable considerations would warrant reimbursement. My review of the record, with due deference to the SRO's findings, shows that the District fulfilled its responsibility.

**IV.**     **CONCLUSION**

For the reasons stated above, Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 12, 18), enter judgment for Defendant, and close the case.

**SO ORDERED.**

Dated: October 28, 2019
          White Plains, New York

_____
          CATHY SEIBEL, U.S.D.J.